**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re   STEPHEN P. KNOX, | : | Chapter 13 |
| | : | |
| Debtor | : | Bky. No. 20-12316 ELF |
| | : | |

| | | |
|---|---|---|
| STEPHEN KNOX, | : | |
| | : | |
| Plaintiff | : | Adv. No.  21-005 |
| | : | |
| v. | : | |
| | : | |
| CARMEL DEVELOPMENT, LLC, | : | |
| | : | |
| Defendant | : | |

# O P I N I O N

## I. INTRODUCTION

Stephen P. Knox ("the Debtor") filed a petition under chapter 13 of the Bankruptcy Code in this court on May 15, 2020. On January 18, 2021, he commenced the above-captioned adversary proceeding against Defendant Carmel Development, LLC ("Carmel"), asserting state law claims under the Pennsylvania Fair Credit Extension Uniformity Act ("the FCEUA"), 73 P.S. §§2740.1 et seq. and the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("the UTPCPL"), 73 P.S. §§201-1 et seq.

In the Complaint, Knox alleges that Carmel purchased the Debtor's residential real property at a tax sale conducted by the City of Philadelphia. Carmel subsequently attempted to obtain possession of the property by filing a landlord-tenant eviction complaint in the Philadelphia Municipal Court. However, rather than complying with the more fulsome

1

procedures required in an ejectment action under the Pennsylvania Rules of Civil Procedure, Carmel improperly invoked the summary procedures of the Pennsylvania Landlord Tenant Act. In doing so, Carmel falsely represented to the state court that the Debtor was a tenant under a residential lease, rather than the former owner of the property.[1] About a month and a half after filing, Carmel voluntarily withdrew its eviction complaint.

The Complaint alleges that Carmel's false representations constitute a violation of FCEUA and UTPCPL. Further, because the Debtor was required to attend several Philadelphia Municipal Court hearings before Carmel withdrew its landlord-tenant complaint, the Debtor asserts that Carmel's actions caused the Debtor to lose a valuable personal services contract that he would have otherwise performed in Virginia. He contends that Carmel is therefore liable under the FCEUA and UTPCPL for actual damages, treble damages for egregious conduct, and attorneys' fees.

Carmel filed an Answer to the Complaint on February 17, 2021. Trial of the adversary proceeding commenced on July 26, 2021 and concluded on August 9, 2021.

For the reasons set forth below, I will enter judgment in favor of Carmel and against the Debtor.[2]

---

[1] In the "main" bankruptcy case, the Debtor is treating Carmel as the holder of a secured claim and providing for that claim pursuant to 11 U.S.C. §§1322(b)(2) and 1325(a). By paying Carmel's secured claim, the Debtor is seeking to reinstate his pre-tax sale legal ownership status. See, e.g., In re Gonzalez, 550 B.R. 711, 720–26 (Bankr. E.D. Pa. 2016). His chapter 13 plan was confirmed on December 8, 2020.

[2] I have an independent duty to ensure that this court has subject matter jurisdiction. See, e.g., Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 76–77 (3d Cir. 2003), cert. denied, 541 U.S. 959 (2004); see also Thomas v. City of Phila., 759 Fed. App'x 110, 111 (3d Cir. Jan. 3, 2019) (nonprecedential) (describing this principle as "axiomatic").

I am satisfied that this court has jurisdiction over this adversary proceeding under 28 U.S.C. §1334(b).                                                                                                  **(f.n. 2 cont.)**

2

## II. FINDINGS OF FACT

Based on the credibility and demeanor of the trial witnesses, the plausibility of their testimony, the existence of corroborating circumstantial, testimonial or documentary evidence, and the totality of the evidentiary record presented at the trial, I make the following findings of fact.

### **Plaintiff Stephen Knox (the "Debtor")**

1. The Debtor resides at 163 West Seymour Avenue, Philadelphia, PA 19144 ("the Property"). (Joint Pretrial Statement ¶ 1) (hereafter "JPS").[3]

2. The Debtor inherited the Property and has been an equitable owner since June 26, 2011. (JPS ¶ 2).

---

**(f.n. 2 cont.)**

The test is whether the litigation which is asserted to be related to a bankruptcy case "will affect in some manner the property to be administered by the bankruptcy trustee or the amount or priority of claims to be repaid." In re Shuman, 277 B.R. 638, 647 (Bankr. E.D. Pa. 2001).

The Debtor did not claim an exemption in the claim asserted in this adversary proceeding and, in any event, the asserted damage claim far exceeds the amount of any available exemption under 11 U.S.C. §522(b)(2) and (d). Thus, if the Debtor were successful in this litigation, unsecured creditors could be entitled to a greater distribution than under the presently confirmed plan. See 11 U.S.C. §1329(a).

Finally, while this is a related proceeding, both parties have consented to the entry of a final order or judgment by this court. (See Adv. No. 21-005, Doc. #'s 12, 13).

[3]   All paragraphs referenced in the Joint Pretrial Statement are those from the Statement of Uncontested Facts.

3. The Debtor's profession consists of freelance work in film, video, two-dimensional animation, three-dimensional environment creation, and graphic design. (July 26 Audio Part 2, at 5:45).[4]

4. The Debtor has worked in film visual effects (VFX) and animation since 2005. (Ex. P-5 at 3).

### Defendant Carmel Development, LLC and the Tax Sale

5. Ilan Levi established Carmel, a Pennsylvania entity in May 2018 for the purpose of real estate development and investment. (August 9 Audio Part 2, at 3:52).

6. Carmel purchased the Property for $38,000.00 at a sheriff's tax sale to on August 15, 2018. (JPS ¶ 3).

7. Carmel paid a deposit of $4,000.00 to the City of Philadelphia on the day of the sheriff's sale, (JPS ¶ 4), and paid the remaining $34,000.00 on September 13, 2018. (JPS ¶ 5; Ex. D-1).

### The State Court Action

8. On November 28, 2018, Carmel filed a landlord-tenant complaint against the Debtor in the Philadelphia Municipal Court, seeking possession of the Property. (JPS ¶¶ 6–7; Ex. P-2; Ex. D-6).

9. In the landlord-tenant complaint, Carmel alleged that it had a lease with the Debtor that began in December 2012, and that the Debtor owed a balance of $1,006.75. (JPS ¶¶ 8–9; Ex. P-2; Ex. D-6).

---

[4] The parties chose not to order an official transcript of the trial of the adversary proceeding (July 26, 2021). Therefore, I will cite to the unofficial audio recording of the trial.

10. On or about December 7, 2018, Carmel caused to be served, and the Debtor received, papers stating that the Debtor would need to appear in court on December 18, 2018.  (JPS ¶ 10; Ex. P-2; Ex. D-6).

11. On December 18, 2018, the Debtor and his attorney attended the scheduled hearing but neither Carmel nor its attorney attended.  (JPS ¶¶ 11–12; Ex. D-6).  The court continued the hearing to January 7, 2019.  (JPS ¶ 13; Ex. D-6).

12. Carmel's counsel, Samuel Ben-Samuel, was unable to attend the hearing on January 7, 2019, but had another attorney attend in his place.  (JPS ¶ 14; Ex. D-6).  On January 7, 2019, the court continued the hearing to January 24, 2019.  (Ex. D-6).

13. Carmel's counsel voluntarily withdrew the case without prejudice on January 14, 2019.  (JPS ¶ 15; Ex. D-6).

14. Mr. Levi understood the case was being dismissed due to Carmel's mistake.  (August 9 Audio Part 2, at 17:06).

15. The Debtor's counsel was not aware of the January 14, 2019 dismissal.  (Id. at 21:35).

16. The Debtor and his counsel appeared in court on January 24, 2019 where they learned that the case already had been dismissed.  (Id. at 15:40).

### The Debtor's Film Director Service Agreement with John Moore

17. On November 15, 2018, the Debtor and John Moore, owner of Moore Designs and Outdoor Living, executed a Film Director Service Agreement (the "Service Agreement"), effective December 1, 2018.  (Ex. P-1).

18. The Debtor prepared the Service Agreement.  (Ex. P-5).

19. Moore Designs and Outdoor Living is located in Haymarket, Virginia.  (Ex. P-1).

5

20. The stated scope of work in the Service Agreement (the "Services") was to "film the entire process of building a deck and patio . . . includ[ing] interviews and production time lapses." (Id.). The Services were to be provided at Moore Designs and Outdoor Living's principal place of business in Haymarket, Virginia. (Id.).

21. The Services were expected to be completed by January 1, 2019. (Id.).

22. The Service Agreement "terminated at the conclusion of the [Services] or on [January 1, 2019]." (Id.).

23. The compensation for the Services was $10,000.00 ("the Compensation"). (Id.).

24. Under the Service Agreement, Moore Designs and Outdoor Living would provide daily food and room and board, for as long as the work lasted, but would not provide for the payment of other expenses incurred by the Debtor. (Id.; July 26 Audio Part 2, at 1:42:55).

25. The Debtor expected the Services to require approximately seven (7) days of work, eight hours each day. (July 26 Audio Part 2, at 1:35:57).

26. The Debtor expected to employ three (3) or four (4) crew members during that time, including his assistant, Elizabeth Deisler. (Id. at 1:36:25).

27. For seven (7) days of work, the Debtor projected expenses of at least $2,490.00.[5]

28. The Debtor did not ask Mr. Moore to pay him part (or all) of the Compensation before the Services were completed. (Id. at 1:21:38). Payment of the Compensation was to be tendered at the end of the Service Agreement. (Ex. P-5).

---

[5] At one point, the Debtor testified that he expected that his expenses for the Services would be approximately $1,000.00. (July 26 Audio Part 2, at 1:35:12). This estimate is not consistent with other parts of his testimony. For example, he testified that he told his assistant and crew (at least four (4) persons) that he would pay them $500.00 each after the Services were completed. (Id. at 1:38:32). In addition, he expected to incur costs for renting lenses and memory cards at $45.00 and $25.00 per day, respectively. (Id. at 1:39:02, 1:39:55). For seven (7) rental days, the equipment costs would run an additional $490.00. This list of expenses does not include travel expenses to and from Virginia, where the filming was to take place.

6

29. During December 2018, the Debtor traveled between Philadelphia, Pennsylvania and Haymarket, Virginia to provide the Services; the Debtor returned to Philadelphia on some weekends.  (Ex. P-5).

30. The Debtor provided the Services from approximately December 3, 2018, through at least December 18, 2018.  (Ex. P-5).

31. On December 18, 2018, the Debtor and his attorney attended the scheduled hearing in the Municipal Court.  (JPS ¶¶ 11–12; Ex. D-6).

32. The Debtor's assistant and film crew did not complete the Services in the Debtor's absence on December 18, 2018.  (July 26 Audio Part 2, at 1:25:16).

33. The Debtor did not travel from Philadelphia to Virginia to finish the Services between December 18, 2018 and January 7, 2019, (id. at 1:23:43), and, after December 18, 2019, never resumed providing the Services (even after January 24, 2019, when he learned that the landlord-tenant complaint had been dismissed).

### III.  DISCUSSION

#### A.

The Debtor seeks to recover monetary damages that he claims resulted from Carmel's violation of the FCEUA.  The Debtor asserts that because he had to attend Municipal Court, rather than performing his obligations under the Service Agreement, Moore canceled the contract.  As a result, the Debtor contends that Carmel's conduct deprived him of the benefits of the Service Agreement, valued at $10,000.00.

Carmel denies that the Debtor suffered any actual damages as a result of any violation of the FCEUA.

Assuming arguendo that Carmel is subject to liability as creditor within the meaning of FCEUA and violated that Act by filing the landlord-tenant complaint, I find that the Debtor failed to prove that the asserted violation caused him to suffer compensable damages.

**B.**

The FCEUA forbids debt collectors and creditors from engaging in unfair or deceptive acts or practices in connection with debt collection. In re Marshall, 613 B.R. 194, 212-13 (Bankr. E.D. Pa. 2020).

The FCEUA does not provide consumers with a separate, private cause of action. Id. at 213. Instead, "[i]f a debt collector or creditor engages in an unfair or deceptive debt collection act or practice under this act, it shall constitute a violation of the . . . Unfair Trade Practices and Consumer Protection Law." See 73 P.S. §2270.5(a). As such, consumers may enforce FCEUA violations via the UTPCPL's remedial provision. Consequently, in order to recover on account of an FCEUA violation, a plaintiff must not only prove that an FCEUA violation occurred, but also the elements necessary to satisfy a UTPCPL claim." Marshall, 613 B.R. at 213-14.

The UTPCPL's remedial provision states:

> Any person who purchases or leases goods . . . for personal, family or household purposes and thereby *suffers any ascertainable loss of money or property*, real or personal, *as a result* of the use or employment by any person of a method, act or practice declared unlawful by . . . this act, *may bring a private action to recover actual damages* . . . . The court may, in its discretion, award up to three times the actual damages sustained . . . and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

73 P.S. §201-9.2(a) (emphasis added).

To meet the requirements of 73 P.S. §201-9.2(a), a plaintiff must show an actual, non-speculative, identifiable loss.  Marshall, 613 B.R. at 214.  Damages under the statute "must be quantifiable and cannot be based on speculation or conjecture."  In re Patterson, 263 B.R. 82, 95 (Bankr. E.D. Pa. 2001).

A UTPCPL plaintiff also must show that the loss suffered resulted from conduct prohibited under the UTPCPL (which includes conduct prohibited under the FCEUA).  Marshall, 613 B.R. at 214.  At the very least, the consumer must show "a causal nexus between the conduct and the harm."  In re Madera, 363 B.R. 718, 733 (Bankr. E.D. Pa. 2007), aff'd, 388 B.R. 586 (E.D. Pa. 2008), aff'd, 586 F.3d 228 (3d Cir. 2009).[6]

### C.

In this case, assuming that Carmel violated the FCUEA, the Debtor must show that Carmel's conduct caused him to suffer a non-speculative, identifiable monetary loss.  The Debtor failed to meet that evidentiary burden.

The Debtor alleges that he has actual damages because he lost a $10,000.00 employment contract when he had to attend hearings based on Defendant's landlord-tenant complaint.  (Compl. ¶¶ 39-40).  Thus, the Debtor was required to prove that he lost $10,000.00 and this loss *resulted from* Carmel's alleged UTPCPL violations.  See Madera, 363 B.R. 733.

---

[6]     In In re Madera, this court granted summary judgment for a mortgage lender when plaintiffs brought a claim against the lender for its alleged violation of Pennsylvania's UTPCPL.  363 B.R. 718, 723, 734.  The plaintiffs' amended complaint "failed to specify any harm *that resulted from* the alleged [UTPCPL] violations."  Id. at 733.  The court explained, "[i]f the harm is that [p]laintiffs entered into an unfavorable loan agreement, the record shows that [p]laintiffs' choice to do so was not because of any conduct of [the lender]."  Id.  Emphasizing that the plaintiffs had a choice in the matter, the court noted, "[plaintiffs] could have walked away or even rescinded up to a week later, but they freely chose to take the loan because of their need for the cash distribution."  Id.

9

The Debtor testified that on December 18, 2018, Mr. Moore told him not to travel from Philadelphia to Virginia to complete the Services until after the hearing on January 7, 2019, was complete. (July 26 Audio Part 2, at 1:33:35). His testimony implies that as a result of this delay (and, presumably, a further delay when the January 7, 2019, court hearing was continued to January 24, 2019), Mr. Moore lost all interest in the project and did not want the Debtor to return to Virginia to complete the work. In this way, it appears that the Debtor seeks to "connect the dots," i.e., establish that his absence on December 18, 2018 and the further delays caused him to lose his anticipated profits from the Service Agreement.

As the factfinder, I conclude that the evidence does not establish a causal relationship between the Debtor's absences to attend court and his loss of the Service Agreement.

The Debtor did not provide any reason why he could not have returned to Virginia immediately after the postponement of the December 18, 2021 hearing. And, he offered no convincing explanation why, after the Debtor missed just a single day on the project (December 18, 2018) — with the next court hearing not scheduled until January 7, 2019 — Mr. Moore did not want him to return to Virginia right away to continue on the project. This omission is especially glaring given that the project was supposed to be completed by January 1, 2019.

As a result of these shortfalls in the Debtor's testimony and the absence of any explanatory testimony from Mr. Moore, I find that the Debtor failed to prove, by a preponderance of the evidence, that Carmel's conduct caused the claimed contract damages.[7]

---

[7] As a result, I need not consider the other defenses asserted by Carmel such as: (1) the two-year statute of limitations, and (2) bona fide error.

10

## IV. CONCLUSION

For the reasons stated above, I will enter judgment in favor of Carmel and against the Debtor.

Date:   December 15, 2021

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**